# EXHIBIT 2

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

BRITTANY WADDELL, ROGER EWING, TONY SMITH, DANIEL HATTEN, DOUGLASS TRIPLETT, ERIK LEWIS, BOB HENDERSON, THOMAS HOLDER, and JAMARCUS DAVIS, individually and on behalf of a class of all others similarly situated,

**Civil Action No. 3:20-cv-340-TSL-RHW**

    Plaintiffs,

       v.

TOMMY TAYLOR, in his official capacity as Interim Commissioner of the Mississippi Department of Corrections; RON KING, in his official capacity as Superintendent of Central Mississippi Correctional Facility; and JOE ERRINGTON, in his official capacity as Superintendent of South Mississippi Correctional Institution,

    Defendants

## REPORT OF HOMER VENTERS, MD, MS

May 24, 2020

# TABLE OF CONTENTS

I.   BACKGROUND AND QUALIFICATIONS.......................................................2

II.   METHODOLOGY.................................................................................4

III.   STATUS OF COVID-19 CASES AND TESTING IN MDOC FACILITIES .....................5

IV.   OBSERVATIONS ...............................................................................9

V.   FINDINGS ......................................................................................11

a.   Do MDOC'S current practices detect the number and severity of COVID-19 cases among staff and detainees and respond in a manner consistent with CDC guidelines and other established clinical standards of care? ..........................................................................11

b.   Do MDOC'S current practices slow the spread of COVID-19 through the facility and between people, both staff and detainees, in a manner consistent with CDC guidelines and other clinical standards of care?..........................................................................16

c.   Do MDOC'S current practices identify and protect high-risk detainees from serious illness and death from COVID-19?..................................................................19

VI.   CONCLUSION: MDOC'S RESPONSE TO COVID-19 AT CMCF AND SMCI IS DEFICIENT. .........................................................................................23

1

This is a review of the Mississippi Department of Corrections' (MDOC) COVID-19 response at Central Mississippi Correctional Facility (CMCF) and South Mississippi Correctional Institute (SMCI), which together house approximately 6,000 individuals.[1] Unless otherwise noted, my reference to MDOC's actions refer to their actions at CMCF and SMCI.

## I.      BACKGROUND AND QUALIFICATIONS

1.      I am a physician, internist, and epidemiologist with over a decade of experience in providing, improving, and leading health services for incarcerated people.[2]  My clinical training includes residency training in internal medicine at Albert Einstein/Montefiore Medical Center (2007) and a fellowship in public health research at the New York University School of Medicine (2009).  My experience in correctional health includes two years visiting immigration detention centers and conducting analyses of physical and mental health policies and procedures for persons detained by the U.S. Department of Homeland Security.  This work included and resulted in collaboration with U.S. Immigration and Customs Enforcement ("ICE") on numerous individual cases of medical release, the formulation of health-related policies, as well as testimony before the U.S. Congress regarding mortality inside ICE detention facilities.

2.      After my fellowship training, I became the Deputy Medical Director of the Correctional Health Services of New York City.  This position included both direct care to persons held in NYC's 12 jails, as well as oversight of medical policies for their care. This role included

---

[1] May 2020 Fact Sheet, MDOC, *available at*  https://www.mdoc.ms.gov/Admin-Finance/MonthlyFacts/2020-5%20Fact%20Sheet.pdf.
[2] My curriculum vitae is attached as Appendix 1.

2

oversight of chronic care, sick call, specialty referral and emergency care. I subsequently was promoted to the positions of Medical Director, Assistant Commissioner, and Chief Medical Officer. In the latter two roles, I was responsible for all aspects of health services including physical and mental health, addiction, quality improvement, re-entry and morbidity and mortality reviews as well as all training and oversight of physicians, nurses, and pharmacy staff. In these roles, I was also responsible for evaluating and making recommendations on the health implications of numerous security policies and practices including use of force and restraints.

3. During this time, I managed multiple communicable disease outbreaks including H1N1 in 2009, which impacted almost 1/3 of housing areas inside the adolescent jail, multiple seasonal influenza outbreaks, a recurrent legionella infection and several other smaller outbreaks.

4. In March 2017, I left Correctional Health Services of New York City to become the Director of Programs for Physicians for Human Rights. In this role, I oversaw all programs of Physicians for Human Rights, including training of physicians, judges and law enforcement staff on forensic evaluation and documentation, analysis of mass graves and mass atrocities, documentation of torture and sexual violence, and analysis of attacks against healthcare workers. I subsequently worked with the nonprofit Community Oriented Correctional Health Services (COCHS) in promoting evidence-based health services for people with justice involvement. I have also worked as an independent correctional health expert since 2017.  In my roles as a correctional health physician I have conducted over 50 facility inspections, three of which have been specific for assessing the adequacy of COVID-19 response.

5. The following report is submitted as an evaluation of MDOC's current COVID-19 response.

6.     The purpose if this report is to focus on the adequacy of infection control and other public health measures currently being implemented to prevent serious illness and death among staff and detained people, including people with medical vulnerabilities as identified by the CDC, within these facilities in light of the current COVID-19 pandemic.

7.     I have been retained as an expert by counsel for the plaintiffs in the above-captioned matter. I am being compensated for my work. This remuneration is not contingent on my opinions and does not influence my conclusions in any way.

## II.     METHODOLOGY

8.     I have conducted this assessment and review of information with the following questions in mind:

    a.  Do MDOC's current practices detect the number and severity of COVID-19 cases among detainees, and are they consistent with established standards of care for infection control and CDC guidelines?

    b.  Do MDOC's current practices prevent unnecessary hospitalization and death and slow the spread of COVID-19 in a manner consistent with established standards of care for infection control and CDC guidelines?

    c.  Do MDOC's current practices identify and protect high-risk detainees from serious illness and death from COVID-19?

9.     In order to answer these questions and formulate my assessment, I have relied on the following information:

    a.  MDOC's descriptions of its own COVID-19-related policies and practices, including those on and linked-to its "COVID-19 Information and Updates" webpage, including the pages titled, "COVID-19 Confirmed Inmate Cases" and

4

"COVID-19 Questions and Answers," which describes the measures MDOC has taken to "ensure the well-being of staff and inmates";[3]

b. Declarations of people currently detained by MDOC, including Daniel Hatten (CMCF), Jamarcus Davis (SMCI), Roger Ewing (CMCF), Bob Henderson (SMCI), Thomas Holder (SMCI), Tony Smith (CMCF), Erik Lewis (SMCI), Oziel Guzman (SMCI), Brent Ryan (SMCI), Derrick Guyton (Parchman hospital unit), Douglass Triplett (SMCI), Brittany Waddell (CMCF).

## III.    STATUS OF COVID-19 CASES AND TESTING IN MDOC FACILITIES

10.    As of May 1, 2020, MDOC had 18,132 men and women in custody.[4] As of May 22, 2020, MDOC had tested 68 inmates, representing 0.3% of its population in custody.[5] Testing has resulted in 21 documented cases of COVID-19 among inmates in the MDOC system as of May 20, 2020.[6]  One death has been reported among inmates from COVID-19.[7] I have not found information about the number of hospitalizations of inmates to date due to COVID-19.

---

[3] MDOC maintains a webpage with "COVID-19 Information and Updates," which includes the link to its "COVID-19 Q&A" and its "Confirmed Cases" listing the location of inmates testing positive for COVID-19. *See, e.g.,* Appendix 2, which includes for May 18, 2020 the set of (1) the main "COVID-19 Information and Updates" page along with the linked-to (2) "COVID-19 Questions and Answers" and (3) "COVID-19 Confirmed Inmate Cases" pages (MDOC COVID-19 Main Page, Q&A, and Confirmed Inmate Cases, May 18, 2020).
[4] May 2020 Fact Sheet, MDOC, *available at* https://www.mdoc.ms.gov/Admin-Finance/MonthlyFacts/2020-5%20Fact%20Sheet.pdf.
[5] *See* Appendix 4, COVID-19 Questions and Answers, Miss. Dept. of Corr. (updated May 22, 2020) (citing practices necessary to "ensure the well-being of staff and inmates") ("COVID-19 Q&A, May 22, 2020").
[6] *See* Appendix 3, COVID-19 Questions and Answers, Miss. Dept. of Corr. (updated May 21, 2020) (citing practices necessary to "ensure the well-being of staff and inmates") ("COVID-19 Q&A, May 21, 2020").
[77] Jimmie E. Gates, *Mississippi Inmate Who Died Tested Positive for COVID-19*, Clarion Ledger (Apr. 13, 2020), *available at* https://www.clarionledger.com/story/news/2020/04/13/first-confirmed-case-covid-19-state-inmate/2986782001/.

11.     The state of Mississippi has reportedly tested about 51,000 people to date, or approximately 1.7% of its population.[8] Of those tested, approximately 26% (roughly 13,005 people) have received positive test results.[9]

12.     The CDC has classified as "High Priority" the testing of symptomatic residents of prisons and jails; only testing of patients in hospitals and healthcare workers share this High Priority classification.[10]    Testing of non-incarcerated people with COVID-19 symptoms is categorized by the CDC with a less urgent "Priority" designation.   The difference in priority classification results from the CDC's recognition that the risk of infection and outbreak in a congregative setting is significantly greater than in the community at large.

13.     As of May 15, 2020 (as posted on May 18, 2020),[11] MDOC had tested 44 inmates, representing 0.2% of its population in custody: 34% (15 tests) were positive; 9% (4 tests) were pending; 80% (35 tests) were negative. As of the same date, MDOC had tested 49 staff: 16% (8 tests) were positive; 4% (2 tests) were pending; 80% (39 tests) were negative.

14.     As of May 21, 2020,[12] MDOC had tested 65 inmates, representing 0.3% of its population in custody: 32% (21 tests) were positive; 9% (6 tests) were pending; 58% (38 tests) were negative. As of the same date, MDOC had tested 62 staff: 16% (10 tests) were positive; 15% (9 tests) were pending; 69% (43 tests) were negative.

---

[8]  *See, e.g.,* Anita Lee, *How Mississippi became a COVID-19 testing leader despite 'bottlenecks,' lack of federal help*, SunHerald (May 21, 2020), *available at* https://www.sunherald.com/news/coronavirus/article242153426.html. (reporting that, according to the Mississippi Department of health, the state has tested 51,434 people, or 1.7% of the state's population).

[9]  *13,005 cases of coronavirus identified by Miss. Dept. of Health; 616 deaths*, WLBT Digital (May 23, 2020), *available at* https://www.wlbt.com/2020/05/23/cases-coronavirus-identified-by-miss-dept-health-deaths/.

[10]  *Evaluation and Testing of Coronavirus*, Centers for Disease Control and Prevention, *available at* https://www.cdc.gov/coronavirus/2019-nCoV/hcp/clinical-criteria.html (last visited May 22, 2020).

[11]  Appendix 2, MDOC COVID-19 Main Page, Q&A, and Confirmed Inmate Cases, May 18, 2020.

[12]  *See* Appendix 3, COVID-19 Q&A, May 21, 2020.

15.     As of May 22, 2020,[13] MDOC had tested 68 inmates, representing 0.3% of its population in custody: 34% (23 tests) were positive; 7% (5 tests) were pending; 59% (40 tests) were negative. As of the same date, MDOC had tested 72 staff: 15% (11 tests) were positive; 25% (18 tests) were pending; 60% (43 tests) were negative. It is notable that MDOC tested ten staff within the most recent 24-hour period, all of which are pending. A quarter of all tests for MDOC staff are currently pending.

16.     MDOC states that, "Symptomatic inmates with fever are tested according to Mississippi State Department of Health and CDC guidelines," and that "[inmates] will be quarantined, according to MSDH and CDC guidelines."[14]

17.     The current many-fold difference—of nearly six times—between the percentage of the population tested in the community versus the prisons in Mississippi reveals a systemic and dramatic failure at either or both stages of (1) symptom identification (through passive and active surveillance measures); and (2) reliable application of the state of Mississippi's own criteria for COVID-19 testing at the stage when qualifying symptoms are identified.

18.     A high percentage of positive tests may indicate that MDOC is overwhelmed by COVID-19, but it may also indicate that not enough testing is being conducted..[15] This is because more positive results means the tests are being used mainly to confirm obvious cases, rather than to determine the full scope of infection in the population, which is likely much larger.[16] The sample

---

[13] *See* Appendix 4, COVID-19 Q&A, May 22, 2020.
[14] *See* Appendix 3, COVID-19 Q&A, May 21, 2020.
[15] *See, e.g.,* Pien Huang, *If Most of Your Coronavirus Tests Come Back Positive, You're Not Testing Enough*, Npr.org, *available at* https://www.npr.org/sections/coronavirus-live-updates/2020/03/30/824817807/if-most-of-your-coronavirus-tests-come-back-positive-youre-not-testing-enough.
[16] *Id.*; *see also, e.g.,* Roz Plater, *As Many as 50 Percent of People with COVID-19 Aren't Aware They Have the Virus*, Healthline (Apr. 24, 2020), *available at* https://www.healthline.com/health-news/50-percent-of-people-with-covid19-not-aware-have-virus.

size of days I have analyzed and overall tests MDOC has completed may be too small to draw clear conclusions; however, preliminarily, the relatively high percentage of positive test results in the MDOC system, combined with the obvious deficiencies I outline below in the MDOC efforts to identify people who have COVID-19 symptoms, suggests that only obviously symptomatic individuals are being tested, and that the rate of infection is actually much higher among inmates and staff.  Also of note is that inmates are being tested at a substantially lower rate than staff.  And although staff are being tested with greater frequency, the relatively low percentage of negative staff test results indicates that MDOC may also be undertesting its staff as well.[17]   In the community, Mississippi's testing program generates an average negative rate of 75%.   Among MDOC's staff, the negative testing rate has been as low as 60%, and among MDOC's inmates, the negative testing rate has been as low as 59%.

19.     In sum, this data, and the gross deficiencies I note below, provide strong preliminary evidence that MDOC testing practices are systematically deficient. It is likely that the number of COVID-19 cases confirmed by MDOC in its inmate population is significantly lower than the actual number of COVID-19 cases in MDOC's inmate population. Even if this is not the case, the data reported by MDOC shows a clear and dangerous trend: Confirmed COVID-19 cases are rapidly rising in both staff and inmate populations. Because MDOC COVID-19 practices are deficient, as explained further, it is my opinion that cases of COVID-19 infection among both staff

---

[17] *See* Johns Hopkins University & Medicine, *Which U.S. States Meet WHO Recommended Testing Criteria?*, JHU Coronavirus Resource Center, *available at* https://coronavirus.jhu.edu/testing/testing-positivity ("If a positivity rate is too high, that may indicate that the state is only testing the sickest patients who seek medical attention, and is not casting a wide enough net to know how much of the virus is spreading within its communities.").

and inmates will continue to rapidly increase absent immediate implementation of measures sufficient to minimally manage and slow the spread of COVID-19.

## IV.    OBSERVATIONS

20.    MDOC's descriptions of its own COVID-19-related policies and practices[18] present the following additional concerns relating to MDOC's COVID-19 response.

21.    Identification and response to people with COVID-19 symptoms:

    a.    MDOC policies mention screening of staff for signs and symptoms of COVID-19 but make no mention of screening for inmates, whether newly arrived or incarcerated before the onset of COVID-19.

    b.    MDOC policies mention that inmates with respiratory symptoms are being seen in a "timely manner" but fail to note whether this is within 24 hours or not.

22.    Implementation of infection control and social distancing:

    a.    MDOC policies mention increased access to cleaning products but fail to state that every person has access to cleaning products, soap, paper towels and other basic elements of infection control.

    b.    MDOC policies mention that information on social distancing has been distributed, but fail to mention whether social distancing is being implemented in its facilities.

23.    Identification and protection of high-risk patients:

    a.    There is no mention in MDOC documents about whether they have adopted the CDC criteria for who is at high risk for serious illness or death from COVID-19 infection or whether any special precautions are in place for this group of inmates.[19]

---

[18] *See, e.g.,* Appendices 2, 3, 4.

[19] *People Who are at a Higher Risk for Severe Illness*, Centers for Disease Control and Prevention, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited May 22, 2020).

9

24.     The declarations I have reviewed present the following concerns relating to

MDOC's COVID-19 response.

25.     Identification and response to people with COVID-19 symptoms:

    a.  Lack of timely response to sick call requests.

    b.  Inmates are unaware of any waiver of the co-pay charge for medical care.

    c.  Prolonged time to symptom identification due to short staffing of security personnel.

    d.  Lack of response to urgent medical issues due to short staffing of security personnel.

    e.  Lack of COVID-19 testing of people with multiple signs and symptoms of infection.

    f.  Lack of use of quarantine for staff and inmates who have contact with people infected with COVID-19.

    g.  Lack of medical isolation for inmates with known or suspected COVID-19.

    h.  Lack of screening or any active surveillance of COVID-19 in housing areas.

26.     Implementation of infection control and social distancing including:

    a.  Lack of any effort to implement social distancing during pill call, meals, and other congregate situations.

    b.  Lack of social distancing in sleeping arrangements.

    c.  Lack of soap and towels for hand washing.

    d.  Lack of cleaning supplies for cells and bunkbed living areas, leaving inmates to rely on black market access.

    e.  Lack of cleaning supplies for common areas.

    f.  Inmates make and launder rags themselves for cleaning.

    g.  Charging inmates for soap.

    h.  Providing soap that damages skin.

    i.  Rationing of toilet paper.

    j.  Lack of use of masks and other PPE by correctional staff and inmates.

    k.  Lack of communication about COVID-19 outbreak.

27.     Identification and protection of high-risk patients:

    a.  Housing high-risk patients with others in general population.

    b.  Patients who are high-risk are not screened for symptoms of COVID-19.

    c.  Lack of social distancing in pill line disproportionately impacts high-risk patients.

## V.   FINDINGS

28.     In assessing the COVID-19 response in MDOC, I have used the three original questions stated at the outset of this report for framing.

### a.   Do MDOC'S current practices detect the number and severity of COVID-19 cases among staff and detainees and respond in a manner consistent with CDC guidelines and other established clinical standards of care?

29.     In addition to the testing issues outlined in the previous section, multiple practices appear to be in place at MDOC that would contribute to systematic lack of detection, treatment, and isolation of COVID-19 cases. The lack of testing is currently a bar to effective and timely identification of COVID-19 cases and to effectively slowing the spread of COVID-19.

30.     The lack of systematic screening for symptoms of COVID-19 among detainees is the most obvious contributor to this problem. This problem could be remedied by employing COVID-19 symptom and temperature checks for all detainees at least daily, and at a minimum, for all high-risk detainees daily, in a manner consistent with CDC guidance.[20]

31.     The difficulty initiating the sick call process and the length of time it takes to result in an appointment results in people with COVID-19 symptoms not coming to the attention of health staff. The case of Mr. Jamarcus Davis exemplifies these deficiencies. He reports being in an open bay dorm unit with approximately 100 other men when he became ill with cough, fever, and cold sweats. He submitted a sick call slip based on these issues and was not seen for several days. When he was finally seen, he reports that "They checked my temperature and said I had a fever. They asked how I was feeling and I could barely talk because of all the coughing." He

---

[20] *Symptoms of Coronavirus*, Centers for Disease Control and Prevention, *available at* https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited May 22, 2020).

reports being prescribed cold medicine and returned to his unit without any COVID-19 or other testing. He reports spending the following days in his bed, in extremely close quarters with others and that "Whatever I had spread like wildfire in the zone" and that "I do not know anyone who went to the infirmary because of this illness or was tested for the flu or for coronavirus, and we all talked about how sick we were." This reported lack of response to sick call slips submitted for COVID-19 symptoms is consistent across many of the declarations I reviewed.

32.     To prevent unnecessary severe illness of a symptomatic patient and unnecessary infection of healthy inmates housed with a symptomatic patient, sick call requests should result in a clinical assessment within 24 hours according to basic correctional health standards of care.[21] Currently, MDOC states that its policy is to provide inmates with a face-to-face triage within 24 hours of submitting a sick call slip.[22] As discussed in the sections that follow, the declarations I reviewed support that this is not happening.

33.     Waiting even 24 hours between reporting of symptoms and evaluation can substantially increase the risk of preventable hospitalization for the patient, particularly if he or she is at-risk according to CDC guidance.  This is because coronavirus can cause infections and other complications, which if left untreated, could result in the rapid and irreversible deterioration of health.[23]  Patients with underlying conditions are at particular risk for organ failure, which for some, could fully manifest over the span of a week.[24]  One study found that 17% of their subjects developed Acute Respiratory Distress Syndrome shortly after the first onset of COVID-19

---

[21] Ideally, sick call requests regarding coronavirus symptoms should also be copied into a facility tracking tool to better understand the extent and progress of the outbreak.
[22] *See, e.g.,* Appendix 3, COVID-19 Q&A, May 21, 2020.
[23] *See, e.g.,* Sevim Zaim, et. al, COVID-19 and Multi-Organ Response, *Current Problems in Cardiology*, Elsevier (Apr. 28, 2020), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7187881/.
[24] *Id.*

symptoms, and among those, 65% rapidly worsened and died from multiple organ failure.[25] As a result, the sick call system of any correctional setting must be supplemented with once-daily screenings of all inmates, particularly those who are at high risk of serious illness or death from COVID-19. This represents a combination of active and passive surveillance for COVID-19 symptoms, relying on the active process of screenings and the passive process of sick call.

34.    Waiting even 24 hours between reporting of symptoms and isolation can substantially increase the risk of unnecessarily infecting scores of individuals housed with the symptomatic person. Recent studies show that people infected with coronavirus can spread aerosolized viral particles as they cough, breath, or talk in a 13 foot radius, and that those particles can remain in the air for up to 14 minutes, exposing other people to infection.[26]  Accordingly, failure to immediately isolate an inmate with symptoms results in the continual exposure of people housed in the same space to the virus. Studies also confirm that people with COVID-19 may be infectious days before symptoms appear, meaning that even by the time they report their symptoms, many more people may already have been infected.[27] A rapid response is critical to preventing further spread.

35.    For adequate reporting through the sick call process to function as a means of infection prevention, inmates and staff both need to be trained on an ongoing basis as to what the

---

[25] *Id.*

[26] *See, e.g.,* E.J. Mundell, *Exhaled 'aerosols' spread coronavirus up to 13 feet—and shoes carry the virus, too,* Medical Express (April 17, 2020), *available at* https://medicalxpress.com/news/2020-04-exhaled-aerosols-coronavirus-feetand-virus.html; Knvul Sheikh, *Talking Can Generate Coronavirus Droplets That Linger Up to 14 Minutes*, NY Times (May 14, 2020), *available at* https://www.nytimes.com/2020/05/14/health/coronavirus-infections.html.

[27] *See, e.g.,* Kelly MacNamara, *People with COVID-19 may be infectious days before symptoms: study*, Medical Express (April 15, 2020), *available at* https://medicalxpress.com/news/2020-04-people-covid-infectious-days-symptoms.html.

symptoms of COVID-19 are. As discussed in the sections that follow, the declarations I reviewed support that this is not happening.

36.     Anyone with more than one COVID-19 symptom and/or sign should be offered testing.

37.     Another element to the likely significant undercounting of COVID-19 cases is the ongoing belief that sick call requires a co-pay by inmates. MDOC has stated on their website that the sick call fee for COVID-19 symptoms is waived during the pandemic. In the declarations that I reviewed, inmates consistently reported that they were unaware of any waiver and that the co-pay remained an ongoing disincentive to reporting COVID-19 symptoms. As Mr. Hatten reported, "Some people would not want to go to medical because of the six dollar sick call charge." Mr. Lewis reported the same: "A lot of people can't even afford six dollars. Six dollars is two bars of soap, 5-6 meals; it's a lot of money."

38.     None of the declarants whose statements I reviewed were aware that the sick call charge had been waived or had heard anything about this change. Because of the difficulties that I have seen arise in trying to parse retroactively whether a sick call request was for a COVID-19-related symptom or not, the most effective means I have seen so far to ensure copays do not disincentivize symptom reporting is to waive all medical visit copays during the pandemic. However, this is not required by CDC guidance, so merely informing inmates of the current policy would satisfy the baseline measure.

39.     It is apparent that MDOC has significant deficiencies in the care of people who are identified as having COVID-19 symptoms. People who submitted declarations report that when a person became ill with COVID-19 symptoms, they were returned to their original housing area without COVID-19 testing. When quarantine is implemented, it appears that MDOC does not

14

follow basic CDC guidelines. Mr. Henderson reported that in his building, an inmate became ill and that housing area was placed in quarantine, with the sick inmate still inside the housing area. He said, "They did not move the inmate from the zone, just quarantined the whole building." This practice violates basic principles of infection control and CDC guidelines, since a quarantine is meant for people who were in contact with a known or suspected case of COVID-19, and medical isolation is where any known or suspected case should be taken immediately, so as to lower the risk of transmission to others. Ms. Waddell talked about her quarantine, "A couple of weeks ago, an officer opened the door to the zone, yelled that we were quarantined for fourteen days, and shut the door. We weren't told anything more. Only later did we happen to learn from a guard that another guard who had been on our zone had coronavirus symptoms." Ms. Waddell continued, "During the fourteen-day quarantine period, we had our temperature checked a total of three times."

40.     In addition to addressing the systematic barriers to meeting its own policy of responding to sick call requests within 24 hours, MDOC must institute an active surveillance program that checks every inmate for signs and symptoms of COVID-19 on a daily basis, especially high-risk inmates. Implementation of this process will actually reduce the need for sick call requests and will increase the access to care for people with COVID-19 and decrease the time that their illness progresses from mild to severe stages.

15

**b.  *Do MDOC'S current practices slow the spread of COVID-19 through the facility and between people, both staff and detainees, in a manner consistent with CDC guidelines and other clinical standards of care?***

41.     The infection control practices in MDOC reveal multiple deficiencies that ignore CDC guidelines for responding to COVID-19 in detention settings.[28] A lack of cleaning solution in the housing areas is widely reported in the declarations I reviewed. Mr. Henderson reports, "We do not have enough cleaning supplies from MDOC to clean all of the common areas." He adds that "Workers use their own rags that we make from our towels to apply the chemicals to clean common surfaces." Mr. Lewis similarly said the cleaning liquid is "not enough to clean everything in the common areas. We have to clean certain things and not others. We use torn up sheets and towels to apply this [cleaning] liquid."

42.     Even more concerning is the report by multiple people that the lack of access to cleaning supplies has given rise to a black market for these CDC-mandated elements of COVID-19 infection control. Mr. Davis reports "It's possible to buy or trade others for these cleaning supplies, but that is not something many people can afford or want to do. Residents would clean their living spaces if given the opportunity; people are afraid of the coronavirus. They are never enough chemicals to go around to daily sanitize." Mr. Lewis similarly reported, "I trade food for extra soap, so I can keep my space clean. I've traded food, canteen, a towel to get disinfectant. This kind of bartering is not possible for many people. One missed meal would be devastating for some people because they are barely hanging on." Ms. Waddell said, "If you want to clean your rack area yourself, there are rarely any chemicals available because cleaning chemicals meant for

---

[28] "Prevention" *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Centers for Disease Control and Prevention, *available at* https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html#prevention (last visited May 22, 2020).

the zone are often not used for that purpose; they are instead diverted and sold or traded for profit." These reports are even more concerning in light of MDOC's refusal to guarantee that inmates will receive an adequate supply of cleaning materials, and instead simply states that "Additional cleaning has occurred."[29]

43.    A lack of soap and paper towels to dry hands is also reported in many of these declarations. Mr. Henderson reports that "The only reason I have enough soap to regularly wash my hands and shower is that I have family support, so I'm able to buy additional soap from commissary." The lack of cleaning chemicals exacerbates the lack of soap. Mr. Lewis reported, "We are not being provided with chemicals to clean these [bunk] areas. I try to clean my bunk area with the Dial soap and water and use a torn sheet or towel to clean." In addition, the soap is used to clean clothes. Ms. Waddell for example said, "We have to wash our clothes with the same soap they give us to wash our hands and bodies. If you don't have money from the outside on your books, you would not have enough soap to keep clean from what the state provides. I have family support to buy soap from canteen, but many don't."

44.    A lack of social distancing in sleeping arrangements, lines for services, day rooms and meals was widely reported in the declarations I reviewed. As Mr. Hatten reported, "When we are in the dayroom having dayroom call or eating, we do not sit with extra space between us and we do not sit six feet apart. No one had told us to do so." Mr. Lewis similarly said, "There is no such thing as social distancing in this prison. We don't even hear that word. That is not practiced here. No one tells us we need to stand six feet apart. There is no one practicing social distancing anywhere in the zone or at the ILAP office or anywhere else I've seen in the facility." Mr. Triplett

---

[29] *See* Appendix 3, COVID-19 Q&A, May 21, 2020.

agreed, "There are no social distancing efforts being taken in this zone or this facility that I've seen. When we go to medical, they pile us in one room. When we see the nurse, there is no social distancing." Ms. Waddell reported, "There is no way to maintain six feet of distance between us anywhere on the zone. Even if you try to avoid physical contact, there is no way to avoid it. If I try to make it to one side of the zone to the other to go to the bathroom, it's like trying to get through a herd of cattle to get to the gate. You have to walk sideways through packs of people pushing through. Especially when it is tray time, everyone is trying to get through each other."

45.     There also appears to be little effort to implement wearing of masks inside housing areas, and detainees report ongoing practices of close contact when they are outside their housing areas, often with detainees from other pods. Mr. Davis reported that "Many officers still walk around the zone without a mask or gloves. Some officers who do wear masks only wear them halfway on their face or just around their neck." Mr. Lewis said, "Officers don't take this seriously. Some have their mask on, some have it half way on, most don't wear it at all. They are putting us at risk." Mr. Triplett reported, "Not many people – whether staff or incarcerated people – wear them [masks] whether they are in the Zone or outside the Zone. When I went to the ILAP office, one of the women did not have a mask on. The Captain visited the Zone on May 11, and he didn't have a mask on." Ms. Waddell said, "One of the officers who was quarantined for fourteen days came back to work without her mask on. Residents on the zone asked her to put a mask on and she did not. She continues to not wear a mask when she is on the zone." MDOC staff appear to have actually prohibited some inmates from wearing the very same masks that were issued to some of them recently. Mr. Ewing reported that "The day after we received the masks, the staff member over our building announced to our zone that we are forbidden to wear the masks in the building because guards cannot identify men on camera if they are wearing a mask."

18

46.     These deviations from clear CDC guidelines place staff at risk alongside inmates. Mr. Davis reported "I have never witnessed staff cleaning equipment they share with other staff." I would expect, as MDOC's numbers prove, that the infection rate among staff members discussed in the previous section reflect the increased risk to which they are exposed because of MDOC's lack of attention to basic infection control in its facilities.

### c.  Do MDOC'S current practices identify and protect high-risk detainees from serious illness and death from COVID-19?

47.     It appears that little effort has been made to identify and protect high-risk inmates in the custody of MDOC. Many of the declarations I reviewed were submitted by people who meet CDC criteria for being at high risk of serious illness or death from COVID-19, and none of them were receiving daily or even regular symptom and temperature checks for COVID-19.

48.     The lack of any social distancing during pill call is a deficiency that disproportionately harms high-risk patients. Many of the declarations I reviewed mentioned this issue. Mr. Henderson reported that "When the nurse comes for pill call, nobody lines up six feet apart. No one instructed us to do so. We all pile at the door." Since people receiving medications are more likely to be in the subset of people the CDC identifies as high-risk, they bear an additional risk of exposure to COVID-19 because MDOC does not implement social distancing in this setting. Mr. Holder reports that even in his unit which is heavily concentrated with high-risk patients like himself, "When nurses come on the zone for pill call and insulin call, nobody lines up six feet apart. No one has told us to stand six feet apart." The lack of social distancing and other precautions also occurs during medical visits. Ms. Waddell reported, "When we are taken to see medical staff, we are brought in large groups by a shuttle van to the reception center and placed in holding tanks together, then taken out of the holding tank one by one to see medical staff. Today, I was held in

19

a holding tank for about forty-five minutes with ten other people waiting. The holding tank was about ten feet by ten feet, at the most, with solid walls, a solid door, no window that opens, and no ventilation. One lady in there would not stop coughing. She was taking her mask on and off. Not all of the other residents had their masks on. As I was leaving, more residents were coming from the van to go into that holding tank. The officers working in the reception center were not wearing their masks or were wearing them on their chin."

49.    High-risk patients should be identified using CDC criteria, should be offered testing for COVID-19, and placed into housing areas with increased levels of infection control and twice daily symptom and sign checks.   Frequent monitoring and protection of these individuals is necessary because they face a disproportionately high risk of rapid organ damage or failure, blood clots, pneumonia, additional viral and bacterial infections, and other severe COVID-19-related complications which require immediate medical treatment.[30]

50.    Many of the deficiencies and deviations from CDC guidelines in MDOC's response to COVID-19 appear linked to the lack of staffing. The declarations I reviewed reported that basic security functions do not occur and that extremely dangerous and harmful practices occur because of a lack of staffing. Mr. Davis reported that "Once for two months we were locked in our cells and never let out: no showers, no yard, no dayroom. We washed our bodies out of a sink for two months. It was very difficult. I am terrified that is what they will do to us if we get sick and the guards stop coming to work." Others reported that this has been a pressing issue during the COVID-19 pandemic. Mr. Roger Ewing reported that "These days, sometimes there are zero

---

[30] *See* Coronavirus disease 2019 (COVID-19), Symptoms & causes, Mayo Clinic, *available at* https://www.mayoclinic.org/diseases-conditions/coronavirus/symptoms-causes/syc-20479963 (visited on May 23, 2020).

20

officers—none in the tower and none on the zone—for many hours at a time, even for an entire shift, which is twelve hours. When staff are on duty, there is usually only one guard in the tower to oversee all 200 individuals" and added that on weekends and evenings, there is no relief when one guard leaves, meaning that one guard is covering 400 residents. Ms. Waddell similarly reported, "When I was housed in D-Zone, it was not uncommon to have no officers anywhere in the tower or on the zone for entire shifts. A shift is twelve hours." Mr. Triplett added, "I've seen guards stay at work so long, they walk off the job and leave the tower unattended. Some guards have to work two buildings, leaving one building of 200 people unattended for hours at a time." Even when present, "Some officers cover the windows, so she can't see us and we can't see them," reported Mr. Lewis. Mr. Triplett agreed, "The tower guards frequently paper over the windows, so no one can see in or out. For the night shift, sometimes they will paper over the windows for the whole night."

51.     This lack of staffing or responsive staff renders it impossible for MDOC to meet its basic obligations to respond to medical emergencies and coordinate access to sick call and other health services. Mr. Ewing reported, "I myself have severe asthma attacks that I can die from. Medical staff have directed me to come straight to the clinic as soon as I feel one coming on. I have tried to do as medical staff have directed and failed because no tower officer-no officer at all-was watching the 400 of us. Those times I have had to ride the asthma attack out, barely able to breathe. I've been lucky so far." Mr. Lewis made similar remarks, "We have to set fires, almost knock the door down to get medical attention. It all depends on the tower officer. If she wants to, or is in the right mood, you may or may not get help." Mr. Lewis continued, "I have seen someone die from a stroke and SMCI did not respond in time. It took them 40 minutes to come, and they took him out dead. After the tower officer made the call, she just sat there and did nothing more."

Mr. Triplett told a similar story: "a guy had chest pains, like a heart attack, and we needed to call an officer and get medical attention, but there was no staff present. We had to kick on the door to see if we could get someone walking by on the sidewalk." Ms. Waddell also reported, "In about April of this year, a pregnant lady's water broke in the bathroom on D-Zone where I lived. . . . Some other residents pulled the pregnant lady's bed into the bathroom by the toilet after her water broke because there was no staff to get medical help. It was terrifying. The only way we finally got medical staff to come help her was after all of the about one hundred women on that zone all started screaming as loud as we could and beating on the walls and banging on the windows facing the Shift Command building. Finally, someone heard us. Guard staff came into the building and wheeled her out on a wheelchair."

52.     This lack of staffing and responsive staff also blocks sick call access. Mr. Henderson reported, "To fill out a sick call slip, a tower officer has to be present. I have to ask him or her to give me a sick call slip. If they give me one, I fill it out. I may have to wait a day to be able to submit it." At times, there is no way to submit a sick call form because the forms ran out. Mr. Lewis reported, "A lot of times, especially during cold and flu season, they won't have any sick call slips. There are no sick calls in the tower now, as I say this, May 7, 2020, because I tried to get one this morning."

53.     The lack of staffing also blocks the Department's ability to implement basic CDC guidelines for responding to COVID-19. Specifically, the lack of staffing makes distribution and use of cleaning supplies impossible, as well as distribution of soap, hand sanitizer and paper towels. It also leaves the facilities without sufficient staff to create quarantine and medical isolation units once people become ill, which are necessary approaches clearly detailed by the CDC.

## VI.    CONCLUSION: MDOC'S RESPONSE TO COVID-19 AT CMCF AND SMCI IS DEFICIENT.

54.    My preliminary assessment of the COVID-19 response by MDOC is that the Department has failed to enact basic CDC guidelines aimed at preventing the spread of COVID-19 and protecting staff and detained people from serious illness and death. The lack of adequate staffing in MDOC facilities has created a dangerous inability of MDOC to effectively implement COVID-19 prevention and management protocols consistent with established standards of care for infection control and CDC guidelines; these implementation gaps are highly likely to result in preventable loss of life among staff and inmates. The failures of MDOC's COVID-19 response fall into the following categories:

a.  Failure to detect the number and severity of COVID-19 cases among staff and detainees and respond in a manner consistent with established standards of care for infection control and CDC guidelines.

b.  Failure to slow the spread of COVID-19 through the facility and between people, both staff and detainees, in a manner consistent with established standards of care for infection control and CDC guidelines.

c.  Failure to identify and protect high-risk detainees from serious illness and death from COVID-19.

55.    In addition to increasing the risk of preventable illness and death from COVID-19, these deficiencies create an imminent risk that more hospitalizations occur as patients become ill without early intervention, which can swiftly overwhelm local hospitals already struggling to care for COVID-19 patients.[31]

---

[31] *See, e.g.,* Chuck Goudie et al., *Illinois prisoners sick with COVID-19 "overwhelm" Joliet hospital*, ABC 7 (Mar. 30, 2020),  *available    at*    https://abc7chicago.com/health/illinois-prisoners-sick-with-covid-19-overwhelm-joliet-hospital/6064085/.

23

Executed this 24th day in May 2020 in Port Washington, New York:

_____

Homer Venters MD, MS

## TABLE OF APPENDICES

| **Appendix 1**: | Curriculum Vitae of Homer Venters (May 22, 2020) |
|---|---|
| **Appendix 2**: | COVID-19 Information and updates, MDOC (May 18, 2020)<br>COVID-19 Questions and Answers, MDOC (May 18, 2020)<br>COVID-19 Confirmed Inmate Cases, MDOC (May 18, 2020) |
| **Appendix 3**: | COVID-19 Questions and Answers, MDOC (May 21, 2020) |
| **Appendix 4**: | COVID-19 Questions and Answers, MDOC (May 22, 2020) |

# APPENDIX 1

# Dr. Homer D. Venters

10 ½ Jefferson St., Port Washington, NY, 11050
hventers@gmail.com, Phone: 646-734-5994

HEALTH ADMINISTRATOR          PHYSICIAN          EPIDEMIOLOGIST

## Professional Profile

- International leader in provision and improvement of health services to patients with criminal justice involvement.
- Innovator in linking care of the incarcerated to Medicaid, health homes, DSRIPs.
- Successful implementer of nations' first electronic health record, performance dashboards and health information exchange among pre-trial patients.
- Award winning epidemiologist focused on the intersection of health, criminal justice and human rights in the United States and developing nations.
- Human rights leader with experience using forensic science, epidemiology and public health methods to prevent and document human rights abuses.

## Professional Experience

**Medical/Forensic Expert**, 3/2016-present
- Review COVID-19 policies and procedures in detention settings.
- Conduct analysis of health services and outcomes in detention settings.
- Conduct site inspections and evaluations in detention settings.
- Produce expert reports, testimony regarding detention settings.

**President**, Community Oriented Correctional Health Services (COCHS), 1/1/2020-4/30/20.
- Lead COCHS efforts to provide technical assistance, policy guidance and research regarding correctional health and justice reform.
- Oversee operations and programmatic development of COCHS
- Serve as primary liaison between COCHS board, funders, staff and partners.

**Senior Health and Justice Fellow**, Community Oriented Correctional Health Services (COCHS), 12/1/18-12/31/2018
- Lead COCHS efforts to expand Medicaid waivers for funding of care for detained persons relating to Substance Use and Hepatitis C.
- Develop and implement COCHS strategy for promoting non-profit models of diversion and correctional health care.

**Director of Programs,** Physicians for Human Rights, 3/16-11/18.
- Lead medical forensic documentation efforts of mass crimes against Rohingya and Yazidi people.
- Initiate vicarious trauma program.
- Expand forensic documentation of mass killings and war crimes.
- Develop and support sexual violence capacity development with physicians, nurses and judges.

o   Expand documentation of attacks against health staff and facilities in Syria and Yemen.

**Chief Medical Officer/Assistant Vice President**, Correctional Health Services, NYC Health and Hospitals Corporation 8/15-3/17.
o   Transitioned entire clinical service (1,400 staff) from a for-profit staffing company model to a new division within NYC H + H.
o   Developed new models of mental health and substance abuse care that significantly lowered morbidity and other adverse events.
o   Connected patients to local health systems, DSRIP and health homes using approximately $5 million in external funding (grants available on request).
o   Reduced overall mortality in the nation's second largest jail system.
o   Increased operating budget from $140 million to $160 million.
o   Implemented nation's first patient experience, provider engagement and racial disparities programs for correctional health.

**Assistant Commissioner,** Correctional Health Services, New York Department of Health and Mental Hygiene, 6/11-8/15.
o   Implemented nation's first electronic medical record and health information exchange for 1,400 staff and 75,000 patients in a jail.
o   Developed bilateral agreements and programs with local health homes to identify incarcerated patients and coordinate care.
o   Increased operating budget of health service from $115 million to $140 million.
o   Established surveillance systems for injuries, sexual assault and mental health that drove new program development and received American Public Health Association Paper of the Year 2014.
o   Personally care for and reported on over 100 patients injured during violent encounters with jail security staff.

**Medical Director,** Correctional Health Services, New York Department of Health and Mental Hygiene, 1/10-6/11.
o   Directed all aspects of medical care for 75,000 patients annually in 12 jails, including specialty, dental, primary care and emergency response.
o   Direct all aspects of response to infectious outbreaks of H1N1, Legionella, Clostridium Difficile.
o   Developed new protocols to identify and report on injuries and sexual assault among patients.

**Deputy Medical Director,** Correctional Health Services, New York Department of Health and Mental Hygiene, 11/08-12/09.
o   Developed training program with Montefiore Social internal medicine residency program.
o   Directed and delivered health services in 2 jails.

**Clinical Attending Physician,** Bellevue/NYU Clinic for Survivors of Torture, 10/07-12/11.

**Clinical Attending Physician,** Montefiore Medical Center Bronx NY, Adult Medicine, ~~1/08-11/09.~~

## Education and Training

**Fellow, Public Health Research,** New York University 2007-2009. MS 6/2009
Projects: Health care for detained immigrants, Health Status of African immigrants in NYC.
**Resident, Social Internal Medicine**, Montefiore Medical Center/Albert  Einstein  University7/2004- 5/2007.
**M.D.,** University of Illinois, Urbana, 12/2003.
**M.S.** Biology, University of Illinois, Urbana, 6/03.
**B.A.** International Relations, Tufts University, Medford, MA, 1989**.**

## Academic Appointments, Licensure

Clinical Associate Professor, New York University College of Global Public Health, 5/18-present.

Clinical Instructor, New York University Langone School of Medicine, 2007-2018.

M.D.  New York (2007-present).

## Media

<u>TV</u>
i24 Crossroads re Suicide in U.S. Jails 8/13/19.

i24 Crossroads re re *Life and Death in Rikers Island* 6/13/19.

Amanpour & Company, NPR/PBS re *Life and Death in Rikers Island* 4/15/19.

CNN, Christiane Amanpour re Forensic documentation of mass crimes against Rohingya. 7/11/18.

i24 Crossroads with David Shuster re health crisis among refugees in Syria. 7/6/18.

Canadian Broadcasting Corporation TV with Sylvie Fournier (in French) re crowd control weapons. 5/10/18

i24 Crossroads with David Shuster re Cholera outbreak in Yemen. 2/15/18.

China TV re WHO guidelines on HIV medication access 9/22/17.

<u>Radio/Podcast</u>
Morning Edition, NPR re Health Risks of Criminal Justice System. 8/9/19.

Fresh Air with Terry Gross, NPR re *Life and Death in Rikers Island*, 3/6/19.

Morning Edition, NPR re *Life and Death in Rikers Island*, 2/22/19.

LeShow with Harry Sherer re forensic documentation of mass crimes in Myanmar, Syria, Iraq. 4/17/18.

<u>Print articles and public testimony</u>
Oped: Four ways to protect our jails and prisons from coronavirus. The Hill 2/29/20.

Oped: It's Time to Eliminate the Drunk Tank. The Hill 1/28/20.

Oped: With Kathy Morse. A Visit with my Incarcerated Mother. The Hill 9/24/19.

Oped: With Five Omar Muallim-Ak. The Truth about Suicide Behind Bars is Knowable. The Hill 8/13/19.

Oped: With Katherine McKenzie. Policymakers, provide adequate health care in prisons and detention centers. CNN Opinion, 7/18/19.

Oped: Getting serious about preventable deaths and injuries behind bars. *The Hill*, 7/5/19.

Testimony: Access to Medication Assisted Treatment in Prisons and Jails, New York State Assembly Committee on Alcoholism and Drug Abuse, Assembly Committee on Health, and Assembly Committee on Correction**.** NY, NY, 11/14/18.

Oped: Attacks in Syria and Yemen are turning disease into a weapon of war, *STAT News*, 7/7/17.

Testimony: Connecticut Advisory Committee to the U.S. Commission on Civil Rights: Regarding the use of solitary confinement for prisoners. Hartford CT, 2/3/17.

Testimony: Venters HD, New York Advisory Committee to the U.S. Commission on Civil Rights: Regarding the use of solitary confinement for juveniles in New York. July 10, 2014. NY NY.

Testimony: New York State Assembly Committee on Correction with the Committee on Mental Health: Regarding Mental Illness in Correctional Settings. November 13, 2014. Albany NY.
Testimony: New York State Assembly Committee on Correction with the Committee on Mental Health: Regarding Mental Illness in Correctional Settings. November 13, 2014. Albany NY.

Oped: Venters HD and Keller AS, The Health of Immigrant Detainees. Boston Globe, April 11, 2009.

Testimony: U.S. House of Representatives, House Judiciary Committee's Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law: Hearing on Problems with Immigration Detainee Medical Care, June 4, 2008.

## *Peer Reviewed Publications*

Parmar PK, Leigh J, **Venters H**, Nelson T. Violence and mortality in the Northern Rakhine State of Myanmar, 2017: results of a quantitative survey of surviving community leaders in Bangladesh. Lancet Planet Health. 2019 Mar;3(3):e144-e153.

**Venters H.** Notions from Kavanaugh hearings contradict medical facts. *Lancet.* 10/5/18.

Taylor GP, Castro I, Rebergen C, Rycroft M, Nuwayhid I, Rubenstein L, Tarakji A, Modirzadeh N, **Venters H**, Jabbour S. Protecting health care in armed conflict: action towards accountability. *Lancet.* 4/14/18.

Katyal M, Leibowitz R, **Venters H**. IGRA-Based Screening for Latent Tuberculosis Infection in Persons Newly Incarcerated in New York City Jails. *J Correct Health Care.* 2018 4/18.

Harocopos A, Allen B, Glowa-Kollisch S, **Venters H**, Paone D, Macdonald R. The Rikers Island Hot Spotters: Exploring the Needs of the Most Frequently Incarcerated. *J Health Care Poor Underserved.* 4/28/17.

MacDonald R, Akiyama MJ, Kopolow A, Rosner Z, McGahee W, Joseph R, Jaffer M, **Venters H**. Feasibility of Treating Hepatitis C in a Transient Jail Population. *Open Forum Infect Dis.* 7/7/18.

Siegler A, Kaba F, MacDonald R, **Venters H**. Head Trauma in Jail and Implications for Chronic Traumatic Encephalopathy. *J Health Care Poor and Underserved.* In Press (May 2017).

Ford E, Kim S, **Venters H**. Sexual abuse and injury during incarceration reveal the need for re-entry trauma screening. *Lancet.* 4/8/18.

Alex B, Weiss DB, Kaba F, Rosner Z, Lee D, Lim S, **Venters H,** MacDonald R. Death After Jail Release. *J Correct Health Care.* 1/17.

Akiyama MJ, Kaba F, Rosner Z, Alper H, Kopolow A, Litwin AH, **Venters H**, MacDonald R. Correlates of Hepatitis C Virus Infection in the Targeted Testing Program of the New York City Jail System. *Public Health Rep.* 1/17.

Kalra R, Kollisch SG, MacDonald R, Dickey N, Rosner Z, **Venters H**. Staff Satisfaction, Ethical Concerns, and Burnout in the New York City Jail Health System. *J Correct Health Care.* 2016 Oct;22(4):383-392.

**Venters H.** A Three-Dimensional Action Plan to Raise the Quality of Care of US Correctional Health and Promote Alternatives to Incarceration. *Am J Public Health.* April 2016.104.

Glowa-Kollisch S, Kaba F, Waters A, Leung YJ, Ford E, **Venters H**. From Punishment to Treatment: The "Clinical Alternative to Punitive Segregation" (CAPS) Program in New York City Jails. *Int J Env Res Public Health.* 2016. 13(2),182.

Jaffer M, Ayad J, Tungol JG, MacDonald R, Dickey N, Venters H. Improving Transgender Healthcare in the New York City Correctional System. *LGBT Health.* 2016 1/8/16.

Granski M, Keller A, Venters H. Death Rates among Detained Immigrants in the United States. *Int J Env Res Public Health.* 2015. 11/10/15.

Michelle Martelle, Benjamin Farber, Richard Stazesky, Nathaniel Dickey, Amanda Parsons, **Homer Venters**. Meaningful Use of an Electronic Health Record in the NYC Jail System. *Am J Public Health.* 2015. 8/12/15.

Fatos Kaba, Angela Solimo, Jasmine Graves, Sarah Glowa-Kollisch, Allison Vise, Ross MacDonald, Anthony Waters, Zachary Rosner, Nathaniel Dickey, Sonia Angell, **Homer Venters**. Disparities in Mental Health Referral and Diagnosis in the NYC Jail Mental Health Service. *Am J Public Health.* 2015. 8/12/15.

Ross MacDonald, Fatos Kaba, Zachary Rosner, Alison Vise, Michelle Skerker, David Weiss, Michelle Brittner, Nathaniel Dickey, **Homer Venters**. The Rikers Island Hot Spotters. *Am J Public Health.* 2015. 9/17/15.

Selling Molly Skerker, Nathaniel Dickey, Dana Schonberg, Ross MacDonald, **Homer Venters**. Improving Antenatal Care for Incarcerated Women: fulfilling the promise of the Sustainable Development Goals. *Bulletin of the World Health Organization.*2015.

Jasmine Graves, Jessica Steele, Fatos Kaba, Cassandra Ramdath, Zachary Rosner, Ross MacDonald, Nathanial Dickey, **Homer Venters**. Traumatic Brain Injury and Structural Violence among Adolescent males in the NYC Jail System *J Health Care Poor Underserved.* 2015;26(2):345-57.

Glowa-Kollisch S, Graves J, Dickey N, MacDonald R, Rosner Z, Waters A, **Venters H**. Data-Driven Human Rights: Using Dual Loyalty Trainings to Promote the Care of Vulnerable Patients in Jail. *Health and Human Rights.* Online ahead of print, 3/12/15.

Teixeira PA[1], Jordan AO, Zaller N, Shah D, **Venters H**. Health Outcomes for HIV-Infected Persons Released From the New York City Jail System With a Transitional Care-Coordination Plan. 2014. *Am J Public Health.* 2014 Dec 18.

Selling D, Lee D, Solimo A, **Venters H.** A Road Not Taken: Substance Abuse Programming in the New York City Jail System. *J Correct Health Care.* 2014 Nov 17.

Glowa-Kollisch S, Lim S, Summers C, Cohen L, Selling D, **Venters H**. Beyond the Bridge: Evaluating a Novel Mental Health Program in the New York City Jail System. *Am J Public Health.* 2014 Sep 11.

Glowa-Kollisch S, Andrade K, Stazesky R, Teixeira P, Kaba F, MacDonald R, Rosner Z, Selling D, Parsons A, **Venters H**. Data-Driven Human Rights: Using the Electronic Health Record to Promote Human Rights in Jail. *Health and Human Rights.* 2014. Vol 16 (1): 157-165.

MacDonald R, Rosner Z, **Venters H**. Case series of exercise-induced rhabdomyolysis in the New York City Jail System. *Am J Emerg Med.* 2014. Vol 32(5): 446-7.

Bechelli M, Caudy M, Gardner T, Huber A, Mancuso D, Samuels P, Shah T, **Venters H.** Case Studies from Three States: Breaking Down Silos Between Health Care and Criminal Justice. *Health Affairs.* 2014. Vol. 3. 33(3):474-81.

Selling D, Solimo A, Lee D, Horne K, Panove E, **Venters H**. Surveillance of suicidal and non-suicidal self-injury in the new York city jail system. *J Correct Health Care*. 2014. Apr;20(2).

Kaba F, Diamond P, Haque A, MacDonald R, **Venters H**. Traumatic Brain Injury Among Newly Admitted Adolescents in the New York City Jail System. *J Adolesc Health*. 2014. Vol 54(5): 615-7.

Monga P, Keller A, **Venters H**. Prevention and Punishment: Barriers to accessing health services for undocumented immigrants in the United States. *LAWS*. 2014. 3(1).

Kaba F, Lewsi A, Glowa-Kollisch S, Hadler J, Lee D, Alper H, Selling D, MacDonald R, Solimo A, Parsons A, **Venters H**. Solitary Confinement and Risk of Self-Harm Among Jail Inmates. *Amer J Public Health*. 2014. Vol 104(3):442-7.

MacDonald R, Parsons A, **Venters H.** The Triple Aims of Correctional Health: Patient safety, Population Health and Human Rights. *Journal of Health Care for the Poor and Underserved*. 2013. 24(3).

Parvez FM, Katyal M, Alper H, Leibowitz R, **Venters H.** Female sex workers incarcerated in New York City jails: prevalence of sexually transmitted infections and associated risk behaviors. *Sexually Transmitted Infections*. 89:280-284. 2013.

Brittain J, Axelrod G, **Venters H.** Deaths in New York City Jails: 2001 – 2009. *Am J Public Health*. 2013 103:4.

Jordan AO, Cohen LR, Harriman G, Teixeira PA, Cruzado-Quinones J, **Venters H.** Transitional Care Coordination in New York City Jails: Facilitating Linkages to Care for People with HIV Returning Home from Rikers Island. *AIDS Behav*. *Nov*. 2012.

Jaffer M, Kimura C, **Venters H.** Improving medical care for patients with HIV in New York City jails. *J Correct Health Care*. 2012 Jul;18(3):246-50.

Ludwig A, Parsons, A, Cohen, L, **Venters H.** Injury Surveillance in the NYC Jail System, *Am J Public Health* 2012 Jun;102(6).

**Venters H**, Keller, AS. *Psychiatric Services*. (2012) Diversion of Mentally Ill Patients from Court-ordered care to Immigration Detention. Epub. 4/2012.

**Venters H**, Gany, F. *Journal of Immigrant and Minority Health* (2011) Mental Health Concerns Among African Immigrants. 13(4): 795-7.

**Venters H,** Foote M, Keller AS. *Journal of Immigrant and Minority Health*. (2010) Medical Advocacy on Behalf of Detained Immigrants. 13(3): 625-8.

**Venters H,** McNeely J, Keller AS. *Health and Human Rights*. (2010) HIV Screening and Care for Immigration Detainees. 11(2) 91-102.

**Venters H,** Keller AS. *Journal of Health Care for the Poor and Underserved*. (2009) The Immigration Detention Health Plan: An Acute Care Model for a Chronic Care Population. 20:951-957.

**Venters H**, Gany, F. *Journal of Immigrant and Minority Health* (2009) African Immigrant Health. 4/4/09.

**Venters H**, Dasch-Goldberg D, Rasmussen A, Keller AS, *Human Rights Quarterly* (2009) Into the Abyss: Mortality and Morbidity among Detained Immigrant. 31 (2) 474-491.

**Venters H**, *The Lancet* (2008) Who is Jack Bauer? 372 (9653).

**Venters H**, Lainer-Vos J, Razvi A, Crawford J, Shaf'on Venable P, Drucker EM, *Am J Public Health* (2008) Bringing Health Care Advocacy to a Public Defender's Office. 98 (11).

**Venters H**, Razvi AM, Tobia MS, Drucker E. *Harm Reduct J.* (2006) The case of Scott Ortiz: a clash between criminal justice and public health. Harm Reduct J. 3:21

Cloez-Tayarani I, Petit-Bertron AF, **Venters HD**, Cavaillon JM (2003) *Internat. Immunol.* Differential effect of serotonin on cytokine production in lipopolysaccharide-stimulated human peripheral blood mononuclear cells.15,1-8.

Strle K, Zhou JH, Broussard SR, **Venters HD**, Johnson RW, Freund GG, Dantzer R, Kelley KW, (2002) *J. Neuroimmunol.* IL-10 promotes survival of microglia without activating Akt. 122, 9-19.

**Venters HD,** Broussard SR, Zhou JH, Bluthe RM, Freund GG, Johnson RW, Dantzer R, Kelley KW, (2001) *J. Neuroimmunol.* Tumor necrosis factor(alpha) and insulin-like growth factor-I in the brain: is the whole greater than the sum of its parts? 119, 151-65.

**Venters HD,** Dantzer R, Kelley KW, (2000) *Ann. N. Y. Acad. Sci.* Tumor necrosis factor-alpha induces neuronal death by silencing survival signals generated by the type I insulin-like growth factor receptor. 917, 210-20.

**Venters HD,** Dantzer R, Kelley KW, (2000) *Trends. Neurosci.* A new concept in neurodegeneration: TNFalpha is a silencer of survival signals. 23, 175-80.

**Venters HD,** Tang Q, Liu Q, VanHoy RW, Dantzer R, Kelley KW, (1999) *Proc. Natl. Acad. Sci. USA.* A new mechanism of neurodegeneration: A proinflammatory cytokine inhibits receptor signaling by a survival peptide, 96, 9879-9884.

**Venters HD,** Ala TA, Frey WH 2nd, (1998) Inhibition of antagonist binding to human brain muscarinic receptor by vanadium compounds. *Recept. Signal. Transduct.* 7, 137-142.

**Venters HD**, Tang Q, Liu Q, VanHoy RW, Dantzer R, Kelley KW, (1999) *Proc. Natl. Acad. Sci. USA.* A new mechanism of neurodegeneration: A proinflammatory cytokine inhibits receptor signaling by a survival peptide, 96, 9879-9884.

**Venters HD,** Ala TA, Frey WH 2nd, (1998) Inhibition of antagonist binding to human brain muscarinic receptor by vanadium compounds. *Recept. Signal. Transduct.* 7, 137-142**.**

**Venters HD**, Bonilla LE, Jensen T, Garner HP, Bordayo EZ, Najarian MM, Ala TA, Mason RP, Frey WH 2nd, (1997) Heme from Alzheimer's brain inhibits muscarinic receptor binding via thiyl radical generation. *Brain. Res.* 764, 93-100.

Kjome JR, Swenson KA, Johnson MN, Bordayo EZ, Anderson LE, Klevan LC, Fraticelli AI, Aldrich SL, Fawcett JR, **Venters HD**, Ala TA, Frey WH 2nd (1997) Inhibition of antagonist and agonist binding to the human brain muscarinic receptor by arachidonic acid. *J. Mol. Neurosci.* 10, 209-217.

## *Honors and Presentations (past 10 years)*

**Keynote Address**, Academic Correctional Health Conference, April 2020, Chapel Hill, North Carolina.

**TedMed Presentation**, Correctional Health, Boston MA, March 2020.

**Finalist, Prose Award for Literature**, Social Sciences category for *Life and Death in Rikers Island*, February, 2020.

**Keynote Address,** John Howard Association Annual Benefit, November 2019, Chicago IL.

**Keynote Address,** Kentucky Data Forum, Foundation for a Healthy Kentucky, November 2019, Cincinnati Ohio.

**Oral Presentation,** Dual loyalty and other human rights concerns for physicians in jails an prisons. Association of Correctional Physicians, Annual meeting. 10/16, Las Vegas.

**Oral Presentation,** Clinical Alternatives to Punitive Segregation: Reducing self-harm for incarcerated patients with mental illness. American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Analysis of Deaths in ICE Custody over 10 Years . American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Medication Assisted Therapies for Opioid Dependence in the New York City Jail System. American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Pathologizing Normal Human Behavior: Violence and Solitary Confinement in an Urban Jail. American Public Health Association Annual Meeting, November 2014, New Orleans, LA.

**Training,** International Committee of the Red Cross and Red Crescent, Medical Director meeting 10/15, Presentation on Human Rights and dual loyalty in correctional health.

**Paper of the Year,** American Public Health Association. 2014. (Kaba F, Lewis A, Glowa-Kollisch S, Hadler J, Lee D, Alper H, Selling D, MacDonald R, Solimo A, Parsons A, Venters H. Solitary Confinement and Risk of Self-Harm Among Jail Inmates. *Amer J Public Health*. 2014. Vol 104(3):442-7.)

**Oral Presentation,** Pathologizing Normal Human Behavior: Violence and Solitary Confinement in an Urban Jail. *American Public Health Association* Annual Meeting, New Orleans LA, 2014.

**Oral Presentation,** Human rights at Rikers: Dual loyalty among jail health staff. American Public Health Association Annual Meeting, New Orleans LA, 2014.

**Poster Presentation**, Mental Health Training for Immigration Judges. American Public Health

Association Annual Meeting, New Orleans LA, 2014.

**Distinguished Service Award;** Managerial Excellence. Division of Health Care Access and Improvement, NYC DOHMH. 2013.

**Oral Presentation,** Solitary confinement in the ICE detention system. American Public Health Association Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Self-harm and solitary confinement in the NYC jail system. American Public Health Association Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Implementing a human rights practice of medicine inside New York City jails. American Public Health Association Annual Meeting, Boston MA, 2013.

**Poster Presentation,** Human Rights on Rikers: integrating a human rights-based framework for healthcare into NYC's jail system. *American Public Health Association* Annual Meeting, Boston MA, 2013.

**Poster Presentation**, Improving correctional health care: health information exchange and the affordable care act. *American Public Health Association* Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Management of Infectious Disease Outbreaks in a Large Jail System. American Public Health Association Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Diversion of Patients from Court Ordered Mental Health Treatment to Immigration Detention. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation**, Initiation of Antiretroviral Therapy for Newly Diagnosed HIV Patients in the NYC Jail System. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Medical Case Management in Jail Mental Health Units. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation**, Injury Surveillance in New York City Jails. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Ensuring Adequate Medical Care for Detained Immigrants. Venters H, Keller A, American Public Health Association Annual Meeting, Denver, CO, 2010.

**Oral Presentation,** HIV Testing in NYC Correctional Facilities. Venters H and Jaffer M, *American Public Health Association,* Annual Meeting, Denver, CO, 2010.

**Oral Presentation,** Medical Concerns for Detained Immigrants. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Growth of Immigration Detention Around the Globe. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Role of Hospital Ethics Boards in the Care of Immigration Detainees. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA,

November 2009.

**Oral Presentation,** Health Law and Immigration Detainees. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Bro Bono Advocacy Award,** Advocacy on behalf of detained immigrants. Legal Aid Society of New York, October 2009.

**Oral Presentation,** Deaths of immigrants detained by Immigration and Customs Enforcement. Venters H, Rasmussen A, Keller A, *American Public Health Association* Annual Meeting, San Diego CA, October 2008.

**Poster Presentation,** Death of a detained immigrant with AIDS after withholding of prophylactic Dapsone. Venters H, Rasmussen A, Keller A, *Society of General Internal Medicine* Annual Meeting, Pittsburgh PA, April 2008.

**Poster Presentation,** Tuberculosis screening among immigrants in New York City reveals higher rates of positive tuberculosis tests and less health insurance among African immigrants. *Society of General Internal Medicine* Annual Meeting, Pittsburgh PA, April 2008.

**Daniel Leicht Award for Achievement in Social Medicine,** Montefiore Medical Center, Department of Family and Social Medicine, 2007.

**Poster Presentation**, Case Findings of Recent Arestees. Venters H, Deluca J, Drucker E. *Society of General Internal Medicine* Annual Meeting, Toronto Canada, April 2007.

**Poster Presentation,** Bringing Primary Care to Legal Aid in the Bronx. Venters H, Deluca J, Drucker E. *Society of General Internal Medicine* Annual Meeting, Los Angeles CA, April 2006.

**Poster Presentation**, A Missed Opportunity, Diagnosing Multiple Myeloma in the Elderly Hospital Patient. Venters H, Green E., *Society of General Internal Medicine* Annual Meeting, New Orleans LA, April 2005.

---

## *Grants: Program*

San Diego County: Review of jail best practices (COCHS), 1/2020, $90,000.

Ryan White Part A - Prison Release Services (PRS). From HHS/HRSA to Correctional Health Services (NYC DOHMH), 3/1/16-2/28/17 (Renewed since 2007). Annual budget $2.7 million.

Ryan White Part A - Early Intervention Services- Priority Population Testing. From HHS/HRSA to Correctional Health Services (NYC DOHMH), 3/1/16-2/28/18 (Renewed since 2013). Annual budget $250,000.

Comprehensive HIV Prevention. From HHS to Correctional Health Services (NYC DOHMH), 1/1/16-12/31/16. Annual budget $500,000.

HIV/AIDS Initiative for Minority Men. From HHS Office of Minority Health to Correctional Health Services (NYC DOHMH), 9/30/14-8/31/17. Annual budget $375,000.

SPNS Workforce Initiative, From HRSA SPNS to Correctional Health Services (NYC DOHMH), 8/1/14-7/31/18. Annual budget $280,000.

SPNS Culturally Appropriate Interventions. From HRSA SPNS to Correctional Health Services (NYC DOHMH), 9/1/13-8/31/18. Annual budget $290,000.

Residential substance abuse treatment. From New York State Division of Criminal Justice Services to Correctional Health Services (NYC DOHMH), 1/1/11-12/31/17. Annual budget $175,000.

Community Action for Pre-Natal Care (CAPC). From NY State Department of Health AIDS Institute to Correctional Health Services (NYC DOHMH), 1/1/05-12/31/10. Annual budget $290,000.

Point of Service Testing. From MAC/AIDS, Elton John and Robin Hood Foundations to Correctional Health Services (NYC DOHMH), 11/1/09-10/31/12. Annual budget $100,000.

Mental Health Collaboration Grant. From USDOJ to Correctional Health Services (NYC DOHMH), 1/1/11-9/30/13. Annual budget $250,000.

## Teaching

**Instructor,** Health in Prisons Course, Bloomberg School of Public Health, Johns Hopkins University, June 2015, June 2014, April 2019.

**Instructor**, Albert Einstein College of Medicine/Montefiore Social Medicine Program Yearly lectures on Data-driven human rights, 2007-present.

## Other Health & Human Rights Activities

**DIGNITY Danish Institute Against Torture**, Symposium with Egyptian correctional health staff regarding dual loyalty and data-driven human rights. Cairo Egypt, September 20-23, 2014.

**Doctors of the World,** Physician evaluating survivors of torture, writing affidavits for asylum hearings, with testimony as needed, 7/05-11/18.

**United States Peace Corps**, Guinea Worm Educator, Togo West Africa, June 1990- December 1991.
> -*Primary Project;* Draconculiasis Eradication. Activities included assessing levels of infection in 8 rural villages and giving prevention presentations to mothers in Ewe and French
> -*Secondary Project;* Malaria Prevention.

## Books

**Venters H.** *Life and Death in Rikers Island*. Johns Hopkins University Press. 2/19.

## Chapters in Books

**Venters H.** Mythbusting Solitary Confinement in Jail. In Solitary Confinement Effects, Practices, and Pathways toward Reform. Oxford University Press, 2020.

MacDonald R. and **Venters H.** Correctional Health and Decarceration. In Decarceration. Ernest Drucker, New Press, 2017.

---

## *Membership in Professional Organizations*

**American Public Health Association**

---

## *Foreign Language Proficiency*

**French**       Proficient
**Ewe**          Conversant

## *Prior Testimony and Deposition*

Benjamin v. Horn, 75 Civ. 3073 (HB) (S.D.N.Y.) as expert for defendants, 2015

Rodgers v. Martin 2:16-cv-00216 (U.S.D.C. N.D.Tx) as expert for plaintiffs, 10/19/17

Fikes v. Abernathy, 2017 7:16-cv-00843-LSC (U.S.D.C. N.D.AL) as expert for plaintiffs 10/30/17.

Fernandez v. City of New York, 17-CV-02431 (GHW)(SN) (S.D.NY) as defendant in role as City Employee 4/10/18.

Charleston v. Corizon Health INC, 17-3039 (U.S.D.C. E.D. PA) as expert for plaintiffs 4/20/18.

Gambler v. Santa Fe County, 1:17-cv-00617 (WJ/KK) as expert for plaintiffs 7/23/18.

Hammonds v. Dekalb County AL, CASE NO.: 4:16-cv-01558-KOB as expert for plaintiffs 11/30/2018.

Mathiason v. Rio Arriba County NM, No. D-117-CV-2007-00054, as expert for plaintiff 2/7/19.

Hutchinson v. Bates et. al. AL, No. 2:17-CV-00185-WKW- GMB, as expert for plaintiff 3/27/19.

Lewis v. East Baton Rouge Parish Prison LA, No. 3:16-CV-352-JWD-RLB, as expert for plaintiff 6/24/19.

Belcher v. Lopinto, No. 2:2018cv07368 - Document 36 (E.D. La. 2019) as expert for plaintiffs 12/5/2019.

Imoerati v. Semple, U.S. District Court, CT. No 3:18cv01847 (RNC), on behalf of plaintiffs, 3/11/20.

## Fee Schedule

Case review, reports, testimony  $500/hour.
Site visits and other travel, $2,500 per day (not including travel costs).

# APPENDIX 2


# MISSISSIPPI
## DEPARTMENT OF CORRECTIONS
### PROVIDE AND PROMOTE PUBLIC SAFETY


INTERIM COMMISSIONER
TOMMY TAYLOR


GOVERNOR
TATE REEVES

Home (/Pages/default.aspx)   About ▾ (/About/Pages/About.aspx)
Divisions ▾ (/Divisions/Pages/default.aspx)
Victim Services & SAVIN ▾ (/Victim-Services/Pages/default.aspx)
News & Media ▾ (/News/Pages/default.aspx)

| Custom Search |

Sear   Inmate Search (https://www.ms.gov/mdoc/inmate)

Parolee Search (https://www.ms.gov/mdoc/parolee)

Area Locations (/About/Pages/Area-Locations.aspx)

Facility Locations (/Pages/Facility-Locations.aspx)

MDOC (/Pages/default.aspx) > COVID-19 Information and Updates

# COVID-19 INFORMATION AND UPDATES

In response to developments with COVID-19, the Mississippi Department of Corrections will continue to take action to protect staff, inmates, and the public. The MDOC is committed to ensuring inmates' rights, safety, and health are safeguarded through this process. The department is in constant communications with the Office of the Governor, the Mississippi Department of Health, the Mississippi Emergency Management Agency (MEMA), and other authorities.

COVID-19 Q&A
    MDOC Questions and Answers for COVID-19  (/Documents/QA%20version%20without%20intro.pdf)

Confirmed Cases
    State, Private and Regional Facilities
    (/Documents/Inmates%20cases%20chart.pdf)

Press Releases (/Documents/Press%20Releases%20Regarding%20COVID-19.docx)

**April 30**
No Contact Reporting to Continue in May
    (/News/PressReleases/No%20Contact%20Reporting%20to%20Continue%20in%20May.pdf)
**April 29**

**(/News/PressReleases/Inmates%20Working%20with%20MPIC%20Fight%20Against%20COVID-19.pdf)**
Inmates Working with MPIC Fight Against COVID-19
    (/News/PressReleases/Inmates%20Working%20with%20MPIC%20Fight%20Against%20COVID-19.pdf)
    (/News/PressReleases/Inmates%20Working%20with%20MPIC%20Fight%20Against%20COVID-19.pdf)
**April 27 (/News/PressReleases/MDOC%20COVID-19%20Update.pdf)**
MDOC COVID-19 Update
    (/News/PressReleases/MDOC%20COVID-19%20Update.pdf)
**April 16 (/News/PressReleases/MDOC%20Update%20on%20Its%20COVID-19%20Response.pdf)**
MDOC Update on its COVID-19 Response
    (/News/PressReleases/MDOC%20Update%20on%20Its%20COVID-19%20Response.pdf)

**April 13**
MDOC Confirms One COVID-19 Case Among Inmates
    (/News/PressReleases/MDOC%20Confirms%20one%20COVID-19%20Case.pdf)

**April 1 (/News/PressReleases/People%20on%20Supervision%20to%20Report%20by%20Phone.pdf)**
MDOC Asks People on Supervision to Report by Phone in Response to COVID-19
    (/News/PressReleases/People%20on%20Supervision%20to%20Report%20by%20Phone.pdf)

**March 20** (/News/PressReleases/MDOC%20Adjusts%20COVID-19%20Prevention%20Response%20for%20Community%20Supervision.pdf)
MDOC Adjusts Reporting for Community Supervision in Response to COVID-19
    (/News/PressReleases/MDOC%20Adjusts%20COVID-19%20Prevention%20Response%20for%20Community%20Supervision.pdf)

**March 16**
    (/News/PressReleases/State%20Phone%20Provider%20Offering%20Free%20Calls%20to%20Inmates.pdf)
Free Inmate Phone Calls Offered by State Phone Provider
    (/News/PressReleases/State%20Phone%20Provider%20Offering%20Free%20Calls%20to%20Inmates.pdf)
    (/News/PressReleases/MDOC%20Adjusts%20COVID-19%20Prevention%20Response%20for%20Community%20Supervision.pdf)
    (/News/PressReleases/People%20on%20Supervision%20to%20Report%20by%20Phone.pdf)

**March 12**
    **(/News/PressReleases/MDOC%20Takes%20Preventative%20Steps%20Against%20Coronavirus%20Exposure.pdf)**
MDOC Takes Steps to Protect Staff, Inmates, Public Against Coronavirus Exposure
    (/News/PressReleases/MDOC%20Takes%20Preventative%20Steps%20Against%20Coronavirus%20Exposure.pdf)
    (/News/PressReleases/MDOC%20Takes%20Preventative%20Steps%20Against%20Coronavirus%20Exposure.pdf)
MDOC Suspends Inmate Transfers as Part of Response to Coronavirus
    (/News/PressReleases/Inmate%20Transfers%20Suspended%20in%20Response%20to%20Coronavirus.pdf)

(/News/PressReleases/MDOC%20Adjusts%20COVID-
19%20Prevention%20Response%20for%20Community%20Supervision.pdf)
(/News/PressReleases/MDOC%20Update%20on%20Its%20COVID-19%20Response.pdf)
(/News/PressReleases/People%20on%20Supervision%20to%20Report%20by%20Phone.pdf)

Governor's Press Conferences (https://governorreeves.ms.gov/covid-19/)
This link will re-direct you to Governor Tate Reeves' website. View press releases from his office, videos of his press briefings, and the executive orders he has issued, all regarding COVID-19.

Resources:

The Mississippi Department of Health (https://msdh.ms.gov/msdhsite/_static/14,0,420.html)

The Mississippi Emergency Management Agency (MEMA) (https://www.msema.org/)

Centers for Disease Control (CDC) (https://www.cdc.gov/)

World Health Organization (WHO) (https://www.who.int/)

(https://www.facebook.com/MS.Department.Of.Corrections)

(http://www.ms.gov)

⌃



**Answers to some of the most frequently asked questions:**
**Last Update: May 15, 5 p.m.**

**Q-1. What is the Mississippi Department of Corrections doing to ensure the well-being of staff and inmates?**
**A.** The MDOC has provided masks to all inmates and correctional staff. Gloves and additional soap are provided. Hand sanitizer is also available in strategic locations, including dining halls.

Signage has been posted throughout MDOC facilities and handout information has been provided to inmates listing symptoms of COVID-19 and informing them how to protect themselves.

Inmates can access medical staff using the sick call system. A face-to-face triage is completed within 24 hours of submission of the sick call request. Medical staff are seeing inmates with acute respiratory symptoms in a timely manner. Symptomatic inmate patients with fever are tested according to Mississippi State Department of Health and CDC guidelines. They will be quarantined or isolated, according to MSDH and CDC guidelines. Affected patients will receive treatment and support and may be transferred to a community hospital, if symptoms become severe. Security staff and non-security staff are screened daily for elevated temperature. Staff found to have a fever (temperature of 100.4 or above) will not be allowed to report to work that day and will be advised to contact their doctor's office. Information regarding frequent hand washing, cough hygiene, and social distancing has been distributed to staff and inmates.

A screening tool questionnaire has also been implemented for staff arriving at a correctional facility. The questions include asking about recent travel from an affected country and possible exposure to someone who has suspected or confirmed COVID-19 disease.



**Q-2. How many confirmed cases are in the inmate population?**
**A.** Fifteen (15) cases of COVID-19 have been confirmed in the inmate population - two (2) at the Mississippi State Penitentiary (MSP) at Parchman, two (2) at the Winston-Choctaw County Regional Correctional Facility, six (6) at the Marion-Walthall County Regional Correctional Facility, and three (3) at the Carroll-Montgomery County Regional Correctional Facility. Two (2) cases have been reported at the East Mississippi Correctional Facility.

**Q-3. What happens in the event of a confirmed case of COVID-19 in an MDOC facility?**
**A.** The MDOC has extensive protocols in place to address scenarios when illness is present. These include immediate quarantine and treatment at facility infirmaries, designated areas or outside hospitals as necessary. Sterilization of all surfaces also is included. Inmates in close proximity to any inmate testing positive are quarantined and receive enhanced screening in addition to wearing a mask. Quarantined inmates are monitored daily for symptoms of the coronavirus.

**Q-4. In addition to the positive inmate cases, how many other inmates have been tested and what is the status of those tests?**
**A.** The MDOC has tested 39 other inmates. Thirty-five (35) tests show negative results. Four (4) tests results are pending.

**Q-5. How many MDOC employees have tested positive?**
**A.** The department has eight (8) employees to test positive for COVID-19.

**Q-6. How many other employees have been tested and what is the status of those tests?**
**A.** Forty (41) other employees have tested. Thirty-nine (39) tests show negative results. Two (2) test results are pending.

**Q-7. When does MDOC test inmates for COVID-19?**
**A.** The criteria for testing inmates are the same as for the general public. Testing priorities include having a fever of 100.4 or above and symptoms of an acute respiratory illness (cough or difficulty breathing). Inmates with fever and respiratory illness are tested for influenza. If the influenza tests are negative, then the inmate is tested for COVID-19. The inmate patient will remain isolated in the infirmary until the test result is received.

**Q-8. Are inmates required to pay medical co-pay during the COVID-19 pandemic?**
**A.** No. Co-pay for any inmate sick call related to influenza or COVID-19 is waived.





**Q-9. How long will the restrictions on visitation for family, friends, and volunteers continue?**
**A.** A date for lifting restrictions has not been determined. Resuming visitation is based on current updates of the COVID-19 impact.

**Q-10. If I usually travel from out of state to Mississippi to visit an inmate, how can I find out the status of the visitation suspension before I leave?**
**A.** Call the facility first. Telephone numbers are listed on the MDOC website (www.mdoc.ms.gov) or contact the Office of Communications at MDOCOfficeofCommunications@mdoc.state.ms.us

**Q-11. Are inmates allowed to meet with their attorneys?**
**A.** Yes. All legal visits are permitted. The legal visit areas are sanitized after each visit.

**Q-12. How can family and friends maintain contact with their incarcerated loved ones?**
**A.** Telephone calls through the inmate phone system will continue uninterrupted. The United States mail also is a good way to communicate with inmates.

**Q-13. In addition to masks, gloves, and hand sanitizers being provided, what other steps have been taken to protect staff and inmates from potential exposure to the coronavirus?**
**A.** Additional cleaning is occurring. Fire and safety staff are ensuring that additional chemicals are available in the housing units. Inmates are receiving antibacterial soap. The MDOC is recommending staff and inmates follow the health guidelines from the Centers for Disease Control (CDC) and Prevention. Social, distance, and hygiene protocols are being followed as well as the avoidance of unnecessary groups or meetings of ten (10) or more.

**Q-14. Can inmates travel on approved leave, such as to funerals or wakes?**
**A.** No. Movement remains suspended.

**Q-15. Are prisons on lockdown because of COVID-19?**
**A.** No. Prisons are not on lockdown.

**Q-16. What activities can inmates participate in during this time? Will activities, including educational and religious programs, continue?**
**A.** Programming remains suspended. However, inmates are free to participate in recreational activities while practicing social distancing.

**Q-17. If an inmate is scheduled to be released, will the release occur?**
**A.** Yes. All scheduled releases will occur as planned.

**Q-18. Will inmates be considered for early release because of the coronavirus pandemic?**
**A.** No. Inmates are being released through the standard release practice.

**Q-19. Are inmate transfers affected?**
**A.** Yes. There are limited transfers of inmates between MDOC facilities unless absolutely necessary.

**Q-20. Is the MDOC accepting new inmates into the system?**
**A.** Yes, but under limited circumstances.

**Q-21. Are inmates allowed to go off grounds for work assignments?**
**A.** No. Inmate work crews remain suspended.

**Q-22. Should people on community supervision, including probation/parole, continue reporting to supervising agents via email or phone?**
**A.** Yes. The phone call will serve as their report. All calls must be made between 7 a.m. and 6 p.m. Monday through Friday. No calls will be accepted on weekends. Individuals are not required to speak with their assigned agent when they call. Individuals must provide the person answering the phone with their name, MDOC number, address, and phone number. They will be asked additional questions related to employment and other issues specifically as a result of the COVID-19 pandemic. Individuals can also email their agent or use technology portals, such as Skype and FaceTime, to communicate. Individuals will be considered non-reporting if they fail to contact the MDOC.

Community supervision also includes house arrest, earned release supervision, conditional medical release, and interstate compact, which includes movement between states.

**Q-23. Is out-of-state travel permitted for individuals on supervision?**
**A.** No. Issuance of permits remains suspended until further notice.



**Q-24. What is the MDOC's current COVID-19 practice regarding individuals in the Interstate Compact program, which handles the transfers between the states of individuals under supervision?**
**A.** Mississippi is only processing incoming transfers that are resident, resident family, and military. Approvals are only for probationers living in the receiving state at the time of sentencing and those with military affiliation.

For outgoing cases, go to interstatecompact.org for a list of state restrictions to see if an offender will be able to transfer to a particular state. The list changes frequently so you should check it often for the most current information.

**For current information regarding the coronavirus, visit the following websites:**

**www.coronavirus.gov**

**www.cdc.gov/COVID19**

**https://msdh.ms.gov**

**The Mississippi Coronavirus Hotline is available 8 a.m. until 5 p.m. Monday-Friday**
**Call 877-978-6453**

## COVID-19 Confirmed Inmate Cases
MISSISSIPPI DEPARTMENT OF CORRECTIONS

| Facility | Positive |
|---|---|
| **STATE INSTITUTIONS** | |
| Mississippi State Penitentiary, Parchman | **2** |
| Central Mississippi Correctional Institution, Pearl | **0** |
| South Mississippi Correctional Institution, Leakesville | **0** |
| | |
| **PRIVATE PRISONS** | |
| East Mississippi Correctional Facility, Meridian | **2** |
| Marshall County Correctional Facility, Holly Springs | **0** |
| Wilkinson County Correctional Facility, Woodville | **0** |
| | |
| **REGIONAL CORRECTIONAL FACILITIES** | |
| Alcorn County Correctional Facility | **0** |
| Bolivar County Correctional Facility | **0** |
| Carroll-Montgomery County Correctional Facility | **3** |
| Chickasaw County Correctional Facility | **0** |
| George County Correctional Facility | **0** |
| Holmes-Humphreys County Correctional Facility | **0** |
| Issaquena County Correctional Facility | **0** |
| Jefferson-Franklin County Correctional Facility | **0** |
| Kemper-Neshoba County Correctional Facility | **0** |
| Leake County Correctional Facility | **0** |
| Marion-Walthall County Correctional Facility | **6** |
| Stone County Correctional Facility | **0** |
| Washington County Correctional Facility | **0** |
| Winston-Choctaw County Correctional Facility | **2** |
| Yazoo County Correctional Facility | **0** |
| **Total** | **15** |

**Last update: May 15, 2020; 5 p.m.**

**For more information about COVID-19 in the MDOC, visit the Information and Updates page at**
https://www.mdoc.ms.gov/Pages/COVID-19-Information-and-Updates.aspx

# APPENDIX 3



**Answers to some of the most frequently asked questions:**
**Last Update: May 21, 5 p.m.**

**Q-1. What is the Mississippi Department of Corrections doing to ensure the well-being of staff and inmates?**
**A.** The MDOC has provided masks to all inmates and correctional staff. Gloves and additional soap are provided. Hand sanitizer stations are installed in strategic locations for both staff and inmates' use. Fire and safety personnel are sanitizing all areas. Information regarding frequent hand washing, cough hygiene, and social distancing has been distributed to staff and inmates. Signs are posted in facilities. Staff and inmates are recommended to follow health guidelines from the Centers for Disease Control (CDC) and Prevention.

Inmates can access medical staff using the sick call system. A face-to-face triage is completed within 24 hours of submission of the sick call request. Medical staff are seeing inmates with acute respiratory symptoms in a timely manner. Symptomatic inmates with fever are tested according to Mississippi State Department of Health and CDC guidelines. They will be quarantined, according to MSDH and CDC guidelines. Affected patients will receive treatment and may be transferred to a community hospital, if symptoms become severe.

Security staff and non-security staff are screened daily for elevated temperature. Staff found to have a fever (temperature of 100.4 or above) will not be allowed to report to work that day and will be advised to contact their doctor's office. Staff members who are feeling ill prior to reporting for duty are urged to stay home and see their physician, if needed. A screening tool questionnaire has also been implemented for staff arriving at a correctional facility. The questions include asking about recent travel from an affected country and possible exposure to someone who has suspected or confirmed COVID-19 disease.



**Q-2. How many confirmed cases are in the inmate population?**
**A.** Twenty-one (21) cases of COVID-19 have been confirmed in the inmate population – two (2) at the Central Mississippi Correctional Facility, two (2) at the Mississippi State Penitentiary (MSP) at Parchman, three (3) at the East Mississippi Correctional Facility, three (3) at the Carroll-Montgomery County Regional Correctional Facility, nine (9) at the Marion-Walthall County Regional Correctional Facility, and two (2) at the Winston-Choctaw County Regional Correctional Facility.

**Q-3. What happens in the event of a confirmed case of COVID-19 in an MDOC facility?**
**A.** The MDOC has extensive protocols in place to address scenarios when illness is present. These include immediate quarantine and treatment at facility infirmaries, designated areas or outside hospitals as necessary. Sterilization of all surfaces also is included. Inmates in close proximity to any inmate testing positive are quarantined and receive enhanced screening in addition to wearing a mask. Quarantined inmates are monitored daily for symptoms of the coronavirus.

**Q-4. In addition to the positive inmate cases, how many other inmates have been tested and what is the status of those tests?**
**A.** The MDOC has tested 44 other inmates. Thirty-eight (38) tests show negative results and six (6) test results are pending.

**Q-5. How many MDOC employees have tested positive?**
**A.** The department has ten (10) employees to test positive for COVID-19.

**Q-6. How many other employees have been tested and what is the status of those tests?**
**A.** Fifty-two (52) other employees have tested. Forty-three (43) tests showed negative results. Nine (9) test results are pending.

**Q-7. When does MDOC test inmates for COVID-19?**
**A.** The criteria for testing inmates are the same as for the general public. Testing priorities include having a fever of 100.4 or above and symptoms of an acute respiratory illness (cough or difficulty breathing). Inmates with fever and respiratory illness are tested for influenza. If the influenza tests are negative, then the inmate is tested for COVID-19. The inmate patient will remain isolated in the infirmary until the test result is received.

**Q-8. Are inmates required to pay medical co-pay during the COVID-19 pandemic?**
**A.** No. Co-pay for any inmate sick call related to influenza or COVID-19 is waived.



*Questions and Answers*

**Q-9. How long will the restrictions on visitation for family, friends, and volunteers continue?**
**A.** A date for lifting restrictions has not been determined. Resuming visitation is based on current updates of the COVID-19 impact.

**Q-10. If I usually travel from out of state to Mississippi to visit an inmate, how can I find out the status of the visitation suspension before I leave?**
**A.** Call the facility first. Telephone numbers are listed on the MDOC website ([www.mdoc.ms.gov](www.mdoc.ms.gov)) or contact the Office of Communications at MDOCOfficeofCommunications@mdoc.state.ms.us

**Q-11. Are inmates allowed to meet with their attorneys?**
**A.** Yes. All legal visits are permitted. The legal visit areas are sanitized after each visit.

**Q-12. How can family and friends maintain contact with their incarcerated loved ones?**
**A.** Telephone calls through the inmate phone system will continue uninterrupted. The United States mail also is a good way to communicate with inmates.

**Q-13. In addition to masks, gloves, and hand sanitizers being provided, what other steps have been taken to protect staff and inmates from potential exposure to the coronavirus?**
**A.** Additional cleaning is occurring. Fire and safety staff are ensuring that additional chemicals are available in the housing units. Inmates are receiving antibacterial soap. The MDOC is recommending staff and inmates follow the health guidelines from the Centers for Disease Control (CDC) and Prevention. Social, distance, and hygiene protocols are being followed as well as the avoidance of unnecessary groups or meetings of ten (10) or more.

**Q-14. Can inmates travel on approved leave, such as to funerals or wakes?**
**A.** No. Movement remains suspended.

**Q-15. Are prisons on lockdown because of COVID-19?**
**A.** No. Prisons are not on lockdown.

**Q-16. What activities can inmates participate in during this time? Will activities, including educational and religious programs, continue?**
**A.** Programming remains suspended. However, inmates are free to participate in recreational activities while practicing social distancing.



**Q-17. If an inmate is scheduled to be released, will the release occur?**
**A.** Yes. All scheduled releases will occur as planned.

**Q-18. Will inmates be considered for early release because of the coronavirus pandemic?**
**A.** No. Inmates are being released through the standard release practice.

**Q-19. Are inmate transfers or movement from county jails affected?**
**A.** Yes. There are limited transfers of inmates between MDOC facilities and from county jails, unless absolutely necessary.

**Q-20. Are inmates allowed to go off grounds for work assignments?**
**A.** No. Inmate work crews remain suspended.

**Q-21. Should people on community supervision, including probation/parole, continue reporting to supervising agents via email or phone?**
**A.** Yes. The phone call will serve as their report. All calls must be made between 7 a.m. and 6 p.m. Monday through Friday. No calls will be accepted on weekends. Individuals are not required to speak with their assigned agent when they call. Individuals must provide the person answering the phone with their name, MDOC number, address, and phone number. They will be asked additional questions related to employment and other issues specifically as a result of the COVID-19 pandemic. Individuals can also email their agent or use technology portals, such as Skype and FaceTime, to communicate. Individuals will be considered non-reporting if they fail to contact the MDOC.

    Community supervision also includes house arrest, earned release supervision, conditional medical release, and interstate compact, which includes movement between states.

**Q-22. Is out-of-state travel permitted for individuals on supervision?**
**A.** No. Issuance of permits remains suspended until further notice.

**Q-23. What is the MDOC's current COVID-19 practice regarding individuals in the Interstate Compact program, which handles the transfers between the states of individuals under supervision?**
**A.** Mississippi is only processing incoming transfers that are resident, resident family, and military. Approvals are only for probationers living in the receiving state at the time of sentencing and those with military affiliation.

  For outgoing cases, go to interstatecompact.org for a list of state restrictions to see if an offender will be able to transfer to a particular state. The list changes frequently so you should check it often for the most current information.



**For current information regarding the coronavirus, visit the following websites:**

**www.coronavirus.gov**

**www.cdc.gov/COVID19**

**https://msdh.ms.gov**

**The Mississippi Coronavirus Hotline is available 8 a.m. until 5 p.m. Monday-Friday**
**Call 877-978-6453**

# APPENDIX 4



**Answers to some of the most frequently asked questions:**
**Last Update: May 22, 5 p.m.**

**Q-1. What is the Mississippi Department of Corrections doing to ensure the well-being of staff and inmates?**
**A.** The MDOC has provided masks to all inmates and correctional staff. Gloves and additional soap are provided. Hand sanitizer stations are installed in strategic locations for both staff and inmates' use. Fire and safety personnel are sanitizing all areas. Information regarding frequent hand washing, cough hygiene, and social distancing has been distributed to staff and inmates. Signs are posted in facilities. Staff and inmates are recommended to follow health guidelines from the Centers for Disease Control (CDC) and Prevention.

Inmates can access medical staff using the sick call system. A face-to-face triage is completed within 24 hours of submission of the sick call request. Medical staff are seeing inmates with acute respiratory symptoms in a timely manner. Symptomatic inmates with fever are tested according to Mississippi State Department of Health and CDC guidelines. They will be quarantined, according to MSDH and CDC guidelines. Affected patients will receive treatment and may be transferred to a community hospital, if symptoms become severe.

Security staff and non-security staff are screened daily for elevated temperature. Staff found to have a fever (temperature of 100.4 or above) will not be allowed to report to work that day and will be advised to contact their doctor's office. Staff members who are feeling ill prior to reporting for duty are urged to stay home and see their physician, if needed. A screening tool questionnaire has also been implemented for staff arriving at a correctional facility. The questions include asking about recent travel from an affected country and possible exposure to someone who has suspected or confirmed COVID-19 disease.



*Questions and Answers*

**Q-2. How many confirmed cases are in the inmate population?**
**A.** Twenty-three (23) cases of COVID-19 have been confirmed in the inmate population – three (3) at the Central Mississippi Correctional Facility, two (2) at the Mississippi State Penitentiary (MSP) at Parchman, three (3) at the East Mississippi Correctional Facility, three (3) at the Carroll-Montgomery County Regional Correctional Facility, one (1) at Delta Correctional Facility, nine (9) at the Marion-Walthall County Regional Correctional Facility, and two (2) at the Winston-Choctaw County Regional Correctional Facility.

**Q-3. What happens in the event of a confirmed case of COVID-19 in an MDOC facility?**
**A.** The MDOC has extensive protocols in place to address scenarios when illness is present. These include immediate quarantine and treatment at facility infirmaries, designated areas or outside hospitals as necessary. Sterilization of all surfaces also is included. Inmates in close proximity to any inmate testing positive are quarantined and receive enhanced screening in addition to wearing a mask. Quarantined inmates are monitored daily for symptoms of the coronavirus.

**Q-4. In addition to the positive inmate cases, how many other inmates have been tested and what is the status of those tests?**
**A.** The MDOC has tested forty-five (45) other inmates. Thirty-eight (38) tests show negative results and five (5) test results are pending.

**Q-5. How many MDOC employees have tested positive?**
**A.** The department has eleven (11) employees to test positive for COVID-19.

**Q-6. How many other employees have been tested and what is the status of those tests?**
**A.** Sixty-one (61) other employees have tested. Forty-three (43) tests showed negative results. Eight-teen (18) test results are pending.

**Q-7. When does MDOC test inmates for COVID-19?**
**A.** The criteria for testing inmates are the same as for the general public. Testing priorities include having a fever of 100.4 or above and symptoms of an acute respiratory illness (cough or difficulty breathing). Inmates with fever and respiratory illness are tested for influenza. If the influenza tests are negative, then the inmate is tested for COVID-19. The inmate patient will remain isolated in the infirmary until the test result is received.

**Q-8. Are inmates required to pay medical co-pay during the COVID-19 pandemic?**
**A.** No. Co-pay for any inmate sick call related to influenza or COVID-19 is waived.



*Questions and Answers*

**Q-9. How long will the restrictions on visitation for family, friends, and volunteers continue?**
**A.** A date for lifting restrictions has not been determined. Resuming visitation is based on current updates of the COVID-19 impact.

**Q-10. If I usually travel from out of state to Mississippi to visit an inmate, how can I find out the status of the visitation suspension before I leave?**
**A.** Call the facility first. Telephone numbers are listed on the MDOC website (www.mdoc.ms.gov) or contact the Office of Communications at MDOCOfficeofCommunications@mdoc.state.ms.us

**Q-11. Are inmates allowed to meet with their attorneys?**
**A.** Yes. All legal visits are permitted. The legal visit areas are sanitized after each visit.

**Q-12. How can family and friends maintain contact with their incarcerated loved ones?**
**A.** Telephone calls through the inmate phone system will continue uninterrupted. The United States mail also is a good way to communicate with inmates.

**Q-13. In addition to masks, gloves, and hand sanitizers being provided, what other steps have been taken to protect staff and inmates from potential exposure to the coronavirus?**
**A.** Additional cleaning is occurring. Fire and safety staff are ensuring that additional chemicals are available in the housing units. Inmates are receiving antibacterial soap. The MDOC is recommending staff and inmates follow the health guidelines from the Centers for Disease Control (CDC) and Prevention. Social, distance, and hygiene protocols are being followed as well as the avoidance of unnecessary groups or meetings of ten (10) or more.

**Q-14. Can inmates travel on approved leave, such as to funerals or wakes?**
**A.** No. Movement remains suspended.

**Q-15. Are prisons on lockdown because of COVID-19?**
**A.** No. Prisons are not on lockdown.

**Q-16. What activities can inmates participate in during this time? Will activities, including educational and religious programs, continue?**
**A.** Programming remains suspended. However, inmates are free to participate in recreational activities while practicing social distancing.



**Q-17. If an inmate is scheduled to be released, will the release occur?**
**A.** Yes. All scheduled releases will occur as planned.

**Q-18. Will inmates be considered for early release because of the coronavirus pandemic?**
**A.** No. Inmates are being released through the standard release practice.

**Q-19. Are inmate transfers or movement from county jails affected?**
**A.** Yes. There are limited transfers of inmates between MDOC facilities and from county jails, unless absolutely necessary.

**Q-20. Are inmates allowed to go off grounds for work assignments?**
**A.** No. Inmate work crews remain suspended.

**Q-21. Should people on community supervision, including probation/parole, continue reporting to supervising agents via email or phone?**
**A.** Yes. The phone call will serve as their report. All calls must be made between 7 a.m. and 6 p.m. Monday through Friday. No calls will be accepted on weekends. Individuals are not required to speak with their assigned agent when they call. Individuals must provide the person answering the phone with their name, MDOC number, address, and phone number. They will be asked additional questions related to employment and other issues specifically as a result of the COVID-19 pandemic. Individuals can also email their agent or use technology portals, such as Skype and FaceTime, to communicate. Individuals will be considered non-reporting if they fail to contact the MDOC.

  Community supervision also includes house arrest, earned release supervision, conditional medical release, and interstate compact, which includes movement between states.

**Q-22. Is out-of-state travel permitted for individuals on supervision?**
**A.** No. Issuance of permits remains suspended until further notice.

**Q-23. What is the MDOC's current COVID-19 practice regarding individuals in the Interstate Compact program, which handles the transfers between the states of individuals under supervision?**
**A.** Mississippi is only processing incoming transfers that are resident, resident family, and military. Approvals are only for probationers living in the receiving state at the time of sentencing and those with military affiliation.

  For outgoing cases, go to interstatecompact.org for a list of state restrictions to see if an offender will be able to transfer to a particular state. The list changes frequently so you should check it often for the most current information.



**For current information regarding the coronavirus, visit the following websites:**

**www.coronavirus.gov**

**www.cdc.gov/COVID19**

**https://msdh.ms.gov**

**The Mississippi Coronavirus Hotline is available 8 a.m. until 5 p.m. Monday-Friday**
**Call 877-978-6453**